FILED

2022 May-10  PM 04:12
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| ROBERT S. STEWART, JR., | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No.: 1:22-cv-00294-MHH-JHE |
| | ) | |
| WARDEN SEAN SNIDER, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Petitioner Robert S. Stewart, Jr. ("Stewart" or "Petitioner") filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, seeking an order directing the Bureau of Prisons ("BOP") to apply First Step Act ("FSA") Earned Time Credits ("ETC") toward his remaining home confinement term. (Doc. 1). Because Stewart's challenge to the BOP's calculation of credits is a challenge to the execution of his sentence, the petition is properly brought as a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241 in the district court for the district in which Stewart is in custody. *See United States v. Kinsey*, 393 F. App'x 663, 664 (11th Cir. 2010) (per curiam) (noting that § 2241 "is the appropriate means by which an inmate may challenge the [BOP's] calculation and execution of his sentence") (citing *Bishop v. Reno*, 210 F.3d 1295, 1304 n.14 (11th Cir. 2000)). The petition was referred to the undersigned pursuant to 28 U.S.C. § 636(b) for preliminary review. Upon consideration, the undersigned recommends Respondent's Motion to Dismiss (doc. 11) be **DENIED**. The undersigned further recommends the petition be **GRANTED** to the extent described below.

### I. Relevant Facts and Claims

Stewart is a federal inmate currently on home confinement within this district. (Doc. 1).

On June 16, 2021, the United States District Court for the Eastern District of Virginia sentenced Stewart to a 21-month term of imprisonment for False Statements, Wire Fraud, and Theft of Government Funds. (Doc. 11-1 at ¶ 5; doc. 11-3). The Sentencing Court ordered Stewart to voluntarily surrender to his designated facility as directed by the BOP. (Doc. 11-3.). On July 28, 2021, Stewart voluntarily surrendered to the Federal Correctional Institution ("FCI") Talladega Satellite Camp to commence his federal sentence. (Doc. 11-1 at ¶ 6). According to Respondent, Stewart's current projected First Step Act ("FSA") release date is October 20, 2022. (*Id.* at ¶ 18; doc. 11-2). Since February 2022, Stewart has been in the BOP's custody on home confinement. (Doc. 11-6).

Stewart requests the Court order the BOP to apply 15 days of ETC for each 30 days of his confinement between January and April 2022 based on his completion of nine Evidence-Based Recidivism Reduction ("EBBR") courses. (Docs. 1, 6, & 7).

Specifically, Stewart contends he is entitled to ETC of 15 days per month, multiplied by 9 months, which is 135 days of FSA ETC. (Doc. 14 at 14). According to Stewart, the BOP has only granted him 75 days; thus, his projected release date of October 20, 2022, should be August 19, 2022, to include the additional 60 days. (*Id.*; *see also* doc. 7 at 3, 4). Additionally, Stewart requests the Court order the BOP to apply projected ETC for the months of May and June 2022, which would move his projected release date to July 19, 2022. (Doc. 7 at 4).

## II. Procedural History

On April 29, 2022, Respondent filed a response to Stewart's petition seeking to have the petition summarily dismissed without an evidentiary hearing. (Doc. 11). That same day, the undersigned entered an order informing Stewart of his right to file affidavits or other materials in opposition to the response and of the possible consequences of not responding. (Doc. 12). The

undersigned further advised that, thereafter, the petition would be taken under advisement, and the undersigned would enter a report and recommendation without further notice. (*Id.*). On May 2, 2022, the Court received a document from Stewart titled "Petitioner's Reply Opposing Summary Respondents' Motion for Summary Judgment." (Doc. 14). The petition is ripe for review.

### III. Analysis

#### A.  Exhaustion Requirement

Generally, a federal prisoner must exhaust his administrative remedies before seeking habeas relief in federal court under 28 U.S.C. § 2241. *See Santiago-Lugo v. Warden*, 785 F.3d 467, 475 (11th Cir. 2015) (quoting *Skinner v. Wiley*, 355 F.3d 1293, 1295 (11th Cir. 2004) ("'We agree with the reasoning of our sister circuits and hold that prisoners seeking habeas relief, including relief pursuant to § 2241, are subject to administrative exhaustion requirements.'"). While *Santiago-Lugo* altered Eleventh Circuit law to the effect that it "is no longer the law of this circuit that exhaustion of administrative remedies is a jurisdictional requirement in a § 2241 proceeding," as the Court also held, "that does not mean that courts may disregard a failure to exhaust and grant relief on the merits if the respondent properly asserts the defense." *Id.* at 474–75. The Eleventh Circuit further explained that "because exhaustion is non-jurisdictional, even when the defense has been preserved and asserted by the respondent throughout the proceeding, a court may skip over the exhaustion issue if it is easier to deny (not grant, of course, but deny) the petition on the merits without reaching the exhaustion question." *Santiago-Lugo*, 785 F.3d at 475.

Simply put, "[t]he exhaustion requirement is still a requirement; it's just not a jurisdictional one." *Santiago-Lugo*, 785 F.3d at 475. A petitioner who has failed to exhaust administrative remedies will find his petition dismissed on those grounds. *See, e.g., Villagran v. United States*, No. 7:18-CV-0101-LSC-JEO, 2020 WL 3022494, at *2 (N.D. Ala. May 13, 2020), report and

recommendation adopted, No. 7:18-CV-00101-LSC-JEO, 2020 WL 3000964 (N.D. Ala. June 4, 2020). Moreover, a prisoner cannot satisfy the exhaustion requirement "by filing an untimely or otherwise procedurally defective administrative grievance or appeal" because "proper exhaustion of administrative remedies is necessary." *Woodford v. Ngo*, 548 U.S. 81, 83–84 (2006). Exceptions to this exhaustion requirement apply only in "'extraordinary circumstances'" and the petitioner "'bears the burden of demonstrating the futility of administrative review.'" *Jaimes v. United States*, 168 F. App'x 356, 359 (11th Cir. 2006) (per curiam) (quoting *Fuller v. Rich*, 11 F.3d 61, 62 (5th Cir. 1994) (per curiam)).

"In order to properly exhaust administrative remedies, a petitioner must comply with an agency's deadlines and procedural rules. *See Woodford*, 548 U.S. at 90–91, (addressing the exhaustion requirement in the Prison Litigation Reform Act)." *Davis v. Warden, FCC Coleman-USP I*, 661 F. App'x 561, 562 (11th Cir. 2016) (some internal citations omitted). The BOP has a four-step process for resolving complaints by prisoners. 28 C.F.R. § 542.10. Initially, a prisoner must attempt to informally resolve the complaint with staff. *Id.* § 542.13(a). If informal attempts are unsuccessful, the prisoner must submit a Request for Administrative Remedy to the warden. *Id.* § 542.14. If the prisoner is unsatisfied with the warden's response, he may appeal to the Regional Director. *Id.* § 542.15. If still unsatisfied, the prisoner may appeal to the Office of General Counsel within thirty days of the Regional Director's response. *Id.*

Here, Stewart acknowledges that he did not exhaust all available administrative remedy requests before seeking relief under 28 U.S.C. § 2241.  (*See* doc. 14 at 15).  Instead, Stewart contends he attempted to comply with the BOP's administrative remedy process, but he was released to home confinement before being able to submit the proper forms.  (Doc. 14 at 14-15, 27-32; *see also* doc. 7 at 3).  Stewart also argues that he attempted to follow the administrative

remedy process, but that he did not get a timely response from the BOP and that continuing to wait would "negatively impact[]" him.  (Doc. 14 at 18-19).

The Eleventh Circuit has suggested that exhaustion may be excused where "'requiring resort to the administrative remedy may occasion undue prejudice to subsequent assertion of a court action.'"  *Shorter v. Warden*, 803 F. App'x 332, 336 (11th Cir. 2020) (quoting *McCarthy v. Madigan*, 503 U.S. 140, 146–47 (1992)).  This occurs when a petitioner can show "'irreparable harm if unable to secure immediate judicial consideration of his claim.'"  *Id.* (quoting *McCarthy*, 503 U.S. at 147).

Stewart did not exhaust his administrative remedies. Nonetheless, considering Stewart's impending release date, balancing the interests favors promptly deciding the issues Stewart raises over the institutional interests protected by the exhaustion defense.

### B.  Merits of First Step Act Earned Credit Time Claim

#### 1.  Authority to Calculate Sentences

The Attorney General, through the BOP, administers inmate sentences. *See* 18 U.S.C. § 3621(a). The BOP has exclusive jurisdiction to determine sentence credits for inmates in the first instance. "After a district court sentences a federal offender, the Attorney General, though the BOP, has the responsibility for administering the sentence." *United States v. Wilson*, 503 U.S. 329, 335 (1992).  The BOP utilizes extensive policies in this administration.  Stewart alleges that the BOP improperly calculated his sentence; however, Respondent contends Stewart does not establish that the BOP failed to follow its policies.  (Doc. 11 at 6-7).

#### 2.  Calculation of Stewart's Sentence

According to 18 U.S.C. § 3585(a), as referenced in the BOP Program Statement 5880.28, Sentence Computation Manual ("CCCA of 1984"), a sentence to a term of imprisonment

commences on the date the defendant is received in custody awaiting transportation to the official detention facility where the sentence is to be served. On July 28, 2021, Stewart voluntarily surrendered to FCI Talladega Satellite Camp to commence his federal sentence. (Doc. 11-1 at ¶ 6; doc. 11-6). Thus, the BOP calculated Stewart's federal sentence as commencing on July 28, 2021, the date he self-surrendered.

The application of prior custody credit toward a federal sentence is governed by 18 U.S.C. § 3585(b), which states:

> (b) Credit for prior custody. – A defendant shall be given credit toward the service of a term of imprisonment for any time he has spent in official detention prior to the date the sentence commences—
>
>> (1) as a result of the offense for which the sentence was imposed; or
>> (2) as a result of any other charge for which the defendant was arrested after the commission of the offense for which the sentence was imposed;
>> *that has not been credited against another sentence.*

18 U.S.C. § 3585(b) (emphasis added). Because the time Stewart spent in custody from February 3, 2021, through February 22, 2021, was not credited towards any other sentence, the BOP granted Stewart 20 days of credit toward his federal sentence for this time period. (Doc. 11-1 at ¶ 12; doc. 11-2).

According to the BOP Program Statement 5880.28, CCCA of 1984, the BOP applies good conduct time ("GCT") in accordance with 18 U.S.C. § 3624(b). The BOP has interpreted this statute to apply GCT only for time served rather than the length of the sentence imposed. *See Barber, et al. v. Thomas, et al.*, 560 U.S. 474 (2010) (upholding this interpretation). Prior to the FSA, the BOP would award 54 days of GCT for each year served. (Doc. 11-1 at ¶ 13). On December 21, 2018, the President signed the First Step Act of 2018 into law. *See* FSA, Public Law 115-391. Prior to the enactment of the FSA, GCT credit was applied only for time *actually served*, rather than the length of the sentence imposed. The FSA amended 18 U.S.C. § 3624(b),

to provide for the application of GCT credit "of up to 54 days for each year of the prisoner's sentence imposed by the court[,]" which is a change to the prior law.  (Doc. 11-1 at ¶ 14; doc. 11-9).  The amendments to § 3624(b), took effect on July 19, 2019.  The changes made to the GCT earnings were made retroactive, but applicable only to sentences not yet satisfied as of July 19, 2019; therefore, any sentence satisfied prior to the effective date of the FSA is not eligible to receive additional GCT credits. (Doc. 11-1 at ¶ 15; doc. 11-10).

According to Respondent, Stewart is currently earning 54 days of GCT and projected to earn  a total of 94 days of good conduct time credit and has no disallowances.  (Doc. 11-1 at ¶ 16; doc. 11-10; doc. 11-11).  Stewart does not dispute this calculation.  (*See* doc. 14 at 2).

Additionally, among several other reforming provisions, the FSA provides an incentive for inmate participation in Evidence-Based Recidivism Reduction ("EBRR") programming, such as classes and productive activities.  The FSA calls this incentive Earned Time Credits ("ETC" or "ECT").  To earn these credits, inmates must complete 30 days of pre-approved, qualifying programming, defined as EBRR courses and Productive Activities, to earn 10 days of ETC. This ETC can either be applied to lengthen an inmate's pre-release custody, such as home confinement or half-way house placement, or be applied to early transfer to supervised release, i.e., early satisfaction of the inmate's sentence. To further qualify, inmates must be classified with a Prisoner Assessment Tool Targeting Estimated Risk and Need ("PATTERN") risk score of "low" or "minimum."

Under 18 U.S.C. § 3632, the United States Department of Justice ("DOJ") was required to "publish[] the risk and needs assessment system on July 19, 2019." *Hand v. Barr*, No. 1:20-cv-348, 2021 WL 392445, at *2 (E.D. Cal. Feb. 4, 2021) (citing Press Release, U.S. Dep't of Justice, *Department of Justice Announces the Release of 3,100 Inmates Under First Step Act, Publishes*

7

*Risk And Needs Assessment System* (July 19, 2019), https://www.justice.gov/opa/pr/department-justice-announces-release-3100-inmates-under-first-step-act-publishes-risk-and).

With respect to implementation of the risk and needs assessment system, 18 U.S.C. § 3621(h) provides:

(1) In general.--Not later than 180 days after the Attorney General completes and releases the risk and needs assessment system (referred to in this subsection as the "System") developed under subchapter D, the Director of the Bureau of Prisons shall, in accordance with that subchapter--

(A) implement and complete the initial intake risk and needs assessment for each prisoner (including for each prisoner who was a prisoner prior to the effective date of this subsection), regardless of the prisoner's length of imposed term of imprisonment, and begin to assign prisoners to appropriate evidence-based recidivism reduction programs based on that determination;
(B) begin to expand the effective evidence-based recidivism reduction programs and productive activities it offers and add any new evidence-based recidivism reduction programs and productive activities necessary to effectively implement the System; and
(C) begin to implement the other risk and needs assessment tools necessary to effectively implement the System over time, while prisoners are participating in and completing the effective evidence-based recidivism reduction programs and productive activities.

(2) Phase-in.--In order to carry out paragraph (1), so that every prisoner has the opportunity to participate in and complete the type and amount of evidence-based recidivism reduction programs or productive activities they need, and be reassessed for recidivism risk as necessary to effectively implement the System, the Bureau of Prisons shall--

(A) provide such evidence-based recidivism reduction programs and productive activities for all prisoners before the date that is 2 years after the date on which the Bureau of Prisons completes a risk and needs assessment for each prisoner under paragraph (1)(A); and
(B) develop and validate the risk and needs assessment tool to be used in the reassessments of risk of recidivism, while prisoners are participating in and completing evidence-based recidivism reduction programs and productive activities.

18 U.S.C. § 3621(h)(1)–(2); *see also Hand*, 2021 WL 392445, at *2.

Under 18 U.S.C. § 3621(h)(1), "all inmates in the BOP system received an initial assessment using the risk and needs assessment system known as the Prisoner Assessment Tool

Targeting Estimated Risk and Need ('PATTERN') by January 15, 2020." *Hand*, 2021 WL 392445, at *3 (citing Press Release, U.S. Dep't of Justice, *Department of Justice Announces Enhancements to the Risk Assessment System and Updates on First Step Act Implementation* (Jan. 15, 2020), https://www.justice.gov/opa/pr/department-justice-announces-enhancements-risk-assessment-system-and-updates-first-step-act). Those inmates who successfully "complete[ ] evidence-based recidivism reduction programming or productive activities . . . shall earn 10 days of time credits for every 30 days of successful participation.'" 18 U.S.C. § 3632(d)(4)(A). As the FSA provides, an inmate who is found "to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism, shall earn an additional 5 days of time credits for every 30 days of successful participation in evidence-based recidivism reduction programming or productive activities." *Id.* § 3632(d)(4)(A)(ii).

The FSA specifically states that a "prisoner may not earn time credits under this paragraph for an evidence-based recidivism reduction program that the prisoner successfully completed prior to the date of enactment of this subchapter." *Id.* § 3632(d)(4)(B). The BOP's website states that "'FSA Time Credits (FTC) may only be earned for completion of assigned evidence-based recidivism reduction programs or productive activities authorized by BOP and successfully completed on or after January 15, 2020.'" Federal Bureau of Prisons, *First Step Act – Frequently Asked Questions*, https://www.bop.gov/inmates/fsa/faq.jsp#fsa_time_credits (last visited May 5, 2022).

"The [First Step Act] provides that by January 15, 2020, BOP 'implement and complete the initial intake risk and needs assessment for each prisoner, begin to assign prisoners to appropriate evidence-based recidivism reduction programs based on that determination, and begin to expand the effective evidence-based recidivism reduction programs and productive activities it

offers.'" PATTERN at 5 (quoting 18 U.S.C. §§ 3621(h)(1)(A)–(B)). "'In order to carry out [18 U.S.C. § 3621(h)(1)], so that every prisoner has the opportunity to participate in and complete the type and amount of evidence-based recidivism reduction programs or productive activities they need,' BOP shall 'provide such evidence-based recidivism reduction programs and productive activities for all prisoners before the date that is 2 years after the date on which the Bureau of Prisons completes a risk and needs assessment for each prisoner under paragraph (1)(A).'" *Id.* (quoting 18 U.S.C. § 3621(h)(2)(A)). As a result, the FSA gives the BOP "two years—until January 15, 2022 . . . to 'phase-in' the evidence-based recidivism reduction programs and productive activities for all prisoners." *Id.* (quoting 18 U.S.C. § 3621(h)(2)(A)).

On January 13, 2022, the DOJ announced that the BOP had finalized the FSA time credit rule and transmitted it to the Federal Register for publication. (Doc. 11-14 at ¶ 7). The final rule was published on January 19, 2022. (*Id.*). This final rule explains the BOP procedures regarding implementation of the specific provisions, including those related to the earning and application of FSA time credits. (*Id.*). The BOP has already begun implementing the FSA final rule and will continue to do so on a rolling basis. (*Id.* at ¶ 8).  The BOP has already begun applying FSA time credits. (*Id.*). As of January 31, 2022, thousands of inmates have already been released to community custody, with hundreds more expected to be released to community supervision within 30 days. (*Id.*).  It is anticipated that in the months to come, thousands more will be eligible for release. (*Id.*).

On January 12, 2022, the BOP established interim procedures to ensure timely implementation of the FSA final rule. (Doc. 11-14 at ¶ 9).  Interim procedures were established to prioritize inmates eligible for immediate benefit in terms of release or pre-release community placement. (*Id.*).  According to Respondent, these interim procedures will remain in effect during

this initial period and will continue pending the completion of an auto-calculation application to the BOP's real-time information system (known as SENTRY) and full integration between SENTRY and the BOP's case management system (known as INSIGHT).  (*Id.*).  Respondent assures the Court that, during the initial period and beyond, the BOP's focus and attention is on ensuring the accurate calculation and application of FSA time credits. (*Id.* at ¶ 10).

For purposes of FSA time credit calculations, Respondent asserts that the BOP is in the process of creating and implementing an application to fully automate calculation so that the BOP Office of Research and Evaluation ("ORE") will no longer have to manually calculate time credits for each inmate. (Doc. 11-14 at ¶ 11).  The BOP expects to "go live" with this application in the coming months. (*Id.*).  Currently, to ease the burden on staff, the BOP decided to set certain cutoff dates for manual FSA time credit calculation. (*Id.* at ¶ 12).  Once an inmate's time credit is calculated, it will not be recalculated again until implementation of the automated computation system. (*Id.*).

Under these interim procedures, the BOP is calculating credit based on the total number of days in the inmate's designated facility divided by 30 days (one-month average) and multiplied by 15 (the allowable credit for inmates with Low or Minimum risk levels).  (Doc. 11-14 at ¶ 13).  BOP uses the date an inmate arrives at his/her initial designated facility or the FSA enactment date in December 2018, whichever is later, as the start date for calculation purposes. (*Id.* at ¶ 14).  Batch data is available monthly and is extracted on the last Saturday of the last full week of the month. (*Id.*).  Beginning on December 25, 2021, monthly data sets of inmates, who are within 24 months of their statutory release date were extracted and their FSA time credits were calculated. (*Id.*).

Due to his impending statutory release date, the BOP grouped Stewart in the initial batch of calculations with a cutoff date of December 25, 2021.  (Doc. 11-14 at ¶ 15).  Respondent admits

that, originally, the BOP incorrectly calculated Stewart's FSA credits to be 61 days. (Doc. 11-14 at ¶ 4; doc. 11-15).  However, the BOP conducted a new calculation, which resulted in Stewart receiving 75 days of FSA credit. (Doc. 11-14 at ¶ 4; doc. 11-16).

The start date for Stewart's FSA calculations is July 28, 2021, the date he arrived at his designated institution. (Doc. 11-14 at ¶ 15).  He remained at his designated institution, and in good standing between July 28, 2021, and December 25, 2021. (*Id.*).  Thus, he had a total of 150 days of eligible time. (*Id.*).  Using the interim procedures, the FSA calculation was performed as follows: 150 (Stewart's eligible days) ÷ by 30 days (one month average) x 15 (allowable credit for inmates like Stewart with Low or Minimum risk levels) = 75.  (*Id.*; doc. 11-16).  Accordingly, Stewart earned 75 days of FSA credit for the time he served from July 28, 2021, through December 25, 2021.  (Doc. 11-14 at ¶ 15; doc. 11-16).

To date, ORE has not recalculated Stewart's FSA ETC calculations to reflect credit for the past four months (approximately January – April) despite his eligibility to earn them. (Doc. 11-14 at ¶ 16).  Like many other similarly situated BOP inmates, Stewart's FSA time calculations are governed by the interim guidance. (*Id.*).  At this time, the BOP does not intend to recalculate FSA time credits for inmates that have already been reviewed, until implementation of the automated system. (*Id.*).  As stated above, once the automated system is up and running Stewart's FSA credits will be updated to include any additional FSA credit that he is entitled to, that have not already been included in this initial calculation. (*Id.*).  According to Respondent, the BOP Office of Information Technology ("OIT") is working diligently to implement the automated system. (*Id.* at ¶ 17).  Although it is unclear when exactly the system will go live, OIT is in the final stages of software testing and could potentially go live within the next 90 days, or approximately early August 2022, barring any unforeseen circumstances. (*Id.*).

The BOP does not calculate time credits based on future projected days. (Doc. 11-14 at ¶ 18). Credit is earned as it accumulates. (*Id.*). This is because an inmate does not earn time credit for days in custody if they refuse to participate in certain programs or are placed in the Special Housing Unit, (*id.*), and it is possible Stewart may not earn time credits in the future. Thus, Stewart's request that the Court order the BOP to apply projected FSA ETC to his sentence for May and June 2022, which he has not yet earned (doc. 7 at 4), is due to be denied.

Respondent contends that the constantly evolving FSA rules and regulations have required the BOP to use its discretion in how and when to calculate FSA credits for all BOP inmates, including Stewart. (Doc. 11 at 17). The BOP has calculated Stewart's FSA ETC and awarded him 94 days of GCT and 75 FSA days for the time he served from July 28, 2021 through December 25, 2021. Once the new system "goes live," Respondent contends that Stewart, just like every other inmate who was in the batch with a cutoff date of December 25, 2021, will have his FSA credits updated automatically and be awarded any credits for the time period after December 25, 2021. (Doc. 11 at 17).

While there does not appear to be anything inherently wrong with the BOP's interim guidance, its application to inmates like Stewart, who are nearing the end of their custody term causes concern. Based only on the credits applied to Stewart's sentence as of December 25, 2021, the BOP calculates his projected release date as October 20, 2022. (Doc. 11-1 at ¶ 18; doc. 11-14 at ¶ 6). According to Stewart, applying 60 days for ETC earned between the BOP's last calculation on December 25, 2021 and April 28, 2022 moves his projected release date to August 2022. (Doc. 7 at 3, 4; doc. 14 at 14, 24). If correct, requiring Stewart to wait until August 2022, or longer, to receive credits for time earned after December 25, 2021 could likely prejudice him by depriving

him of credits he has earned.[1]  As Respondent states, it is unclear when the automated system will be up and running.  While it could be within the next 90 days, that is not guaranteed, and Respondent even hedges this statement with the caveat "absent unforeseen circumstances."  (*See* doc. 14 at 16-17).  Thus, the assertion that Stewart will receive these credits within the next couple months, i.e., in time for them to impact the remainder of his sentence, is speculative.

Respondent does not expressly dispute that Stewart has earned additional ETC between BOP's last calculation on December 25, 2021, and April 28, 2022, which could result in an earlier release date.  (Doc. 11 at 16).  If Stewart has indeed earned additional credits during his time, then they should be awarded to him and reflected in his sentence.  Additionally, because of the uncertainly of the automated system's implementation and Stewart's approaching release date, it is necessary for BOP to reevaluate the application of Stewart's credits at regular intervals, not to exceed every 60 days.

## IV. Recommendation

Based on the foregoing, the undersigned **RECOMMENDS** the Respondent's Motion to Dismiss (doc. 11) be **DENIED**.  The undersigned **FURTHER RECOMMENDS** the petition for a writ of habeas corpus be **GRANTED**, and the BOP be ordered to award Stewart any credit earned between the BOP's December 25, 2021 calculation and April 28, 2022; and the BOP be further ordered to reevaluate Stewart's earned credit time at regular intervals not to exceed every 60 days until the implementation of the automated system.

---

[1] Stewart's claim seeking credits against his sentence will not be rendered moot by his release. After his release from home confinement, he will transition to supervised release, which is part of his sentence and involves some restrictions upon his liberty. *See Shorter v. Warden*, 803 F. App'x 332, 335 (11th Cir. 2020) (citations omitted).

### V. Notice of Right to Object

Any party may file specific written objections to this report and recommendation.  A party must file any objections with the Clerk of Court within fourteen (14) calendar days from the date the report and recommendation is entered.  Objections should specifically identify all findings of fact and recommendations to which objection is made and the specific basis for objecting. Objections also should specifically identify all claims contained in the complaint that the report and recommendation fails to address.  Objections should not contain new allegations, present additional evidence, or repeat legal arguments.  An objecting party must serve a copy of its objections on each other party to this action.

Failing to object to factual and legal conclusions contained in the magistrate judge's findings or recommendations waives the right to challenge on appeal those same conclusions adopted in the district court's order.  In the absence of a proper objection, however, the court may review on appeal for plain error the unobjected to factual and legal conclusions if necessary in the interests of justice.  11th Cir. R. 3-1.

On receipt of objections, a United States District Judge will review *de novo* those portions of the report and recommendation to which specific objection is made and may accept, reject, or modify in whole or in part, the undersigned's findings of fact and recommendations.  The district judge must conduct a hearing if required by law.  Otherwise, the district judge may exercise discretion to conduct a hearing or otherwise receive additional evidence.  Alternately, the district judge may consider the record developed before the magistrate judge, making an independent determination on the basis of that record.  The district judge also may refer this action back to the undersigned with instructions for further proceedings.

A party may not appeal the magistrate judge's report and recommendation directly to the

United States Court of Appeals for the Eleventh Circuit.  A party may only appeal from a final judgment entered by a district judge.

DONE this 10th day of May, 2022.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE

16